[Docket No. 46]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| GARY S. DEMARZO,<br><br>Plaintiff,<br><br>v.<br><br>DELAWARE RIVER AND BAY AUTHORITY,<br><br>Defendant. | Civil Action No. 23-22623<br>(RMB/SAK)<br><br>**OPINION** |

**APPEARANCES**

IONNO & HIGBEE, ATTORNEYS AT LAW, LLC
Sebastian Ionno, Esq.
140 S. Broadway, Suite 5
Pitman, New Jersey, 08071

    *Attorney for Plaintiff*

BROWN & CONNERY, LLP
William F. Cook, Esq.
Kayla L. Louis, Esq.
360 Haddon Avenue
Westmont, New Jersey 08108

    *Attorneys for Defendant*

**RENÉE MARIE BUMB, Chief United States District Judge:**

This matter comes before the Court upon the Motion for Summary Judgment

filed by Defendant Delaware River and Bay Authority (the "DRBA" or "Defendant").

[Def.'s Br. (Docket No. 46-1).]  Plaintiff Gary S. DeMarzo ("Plaintiff") has opposed

the motion. [Pl.'s Opp'n (Docket No. 50).] Defendant has submitted a reply in further support of the motion. [Def.'s Reply (Docket No. 51).] The Court has considered the parties' submissions without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, the Court will **GRANT** Defendant's Motion for Summary Judgment.

## I.    FACTUAL BACKGROUND

Plaintiff, a former mayor of Wildwood, New Jersey, claims that he was unlawfully terminated from his temporary part-time position with the DRBA in retaliation for reporting racial discrimination against a co-worker.

### A. Plaintiff's Employment with the DRBA

Plaintiff was hired by the DRBA as a temporary (or casual), part-time employee in March 2021. [Def.'s SMF ¶ 6.][1] Given the casual nature of his employment, he was not entitled to union representation and was limited in the hours he was permitted to work each week. [*Id.* ¶¶ 6, 8.] He was an at-will employee. [*Id.* ¶ 7.] Plaintiff was employed as a Casual Airport Operations Aide and was responsible for assisting with airport operations, as well as ensuring that airport management was in compliance with all applicable regulations and guidelines. [*Id.* ¶ 10.] He worked primarily at the Cape May Airport and the Millville Airport. [*Id.* ¶ 12.] Prior to his

---

[1]    The material facts underlying this matter are drawn from the parties' respective statements of material facts ("SMF") [Def.'s SMF (Docket No. 46-2); Pl.'s SMF (Docket No. 50-2)], where admitted, as well as the exhibits of record.

hire and throughout his employment with the DRBA, Plaintiff rented a private hangar in his personal capacity from the DRBA.  [*Id.* ¶ 13.]

As part of his onboarding and continuing employment, Plaintiff viewed a video on the DRBA's ethics policies on at least three occasions.  [*Id.* ¶ 15.]  He also reviewed a business ethics presentation that stated: "A conflict of interest is when an employee's financial or personal interests or activities compete, interfere, or even *appear* to compete with an employee's obligations to the [DRBA]."  [*Id.* ¶ 16.]  The DRBA's bylaws include a Code of Ethics that addresses conflicts of interest.  This Code of Ethics prohibits employees from engaging in any personal business transactions or private arrangement for personal profit which is in any way based upon his official position or authority."  [*Id.* ¶ 17.]  It also prohibits employees from engaging in conduct that violates "the public trust or will reflect unfavorably upon the [DRBA]."  [*Id.*]

### B.  DRBA Tenant Lodges Conflict of Interest Complaint Against Plaintiff

On February 7, 2022, Plaintiff's supervisor, Thomas Berry, Senior Manager of Airport Operations, received an email from Jeff Granato, the General Manager of Big Sky Aviation, a DRBA tenant that operated a flight school, regarding a recent encounter with Plaintiff.  [*Id.* ¶¶ 20–21.]  Mr. Granato explained that, while Plaintiff was working, he approached a flight school student and offered to rent the student his personal aircraft.  He explained that he viewed it to be a conflict of interest for "a DRBA employee to solicit a potential aircraft rental away from the [flight school]" that rents from the DRBA.  [*Id.* ¶ 21.]  Beth Smithson, the owner of the flight school,

also reported to Mr. Berry that day that Plaintiff "appears to be loitering at our business fishing for individuals to rent his aircraft, while acting in the capacity of DRBA Operations personnel." [*Id.* ¶ 22.] She asked Mr. Berry whether Plaintiff "offering his aircraft for rent out of Cape May Airport . . . would be a conflict of interest with his employment with the DRBA?" [*Id.*]

When Mr. Berry questioned Plaintiff about the incident, Plaintiff denied ever offering to rent his aircraft to anyone at or near the flight school and recognized that it would be inappropriate to do so. [*Id.* ¶¶ 23–24.] Mr. Berry reiterated the DRBA's ethics policies concerning soliciting business while a DRBA employee. [*Id.* ¶¶ 25–26.] Despite Plaintiff's denial, Stephen Williams, DRBA Director of Airport Operations and Deputy Executive Director, testified that he had no reason to doubt the flight school's accusation against Plaintiff given the seriousness of the accusation and his knowledge of the flight school's excellent reputation and the strong business relationship between the two entities. [Williams Dep. Tr. 77:13–78:4, Def.'s SMF Ex. Q (Docket No. 46-5); Def.'s SMF ¶ 29.]

### C. Plaintiff's Business Negotiations with the DRBA on behalf of the Wildwood Helicopter Company

Plaintiff is the sole owner and president of the Wildwood Helicopter Company ("WHC"), founded in 2000, which previously operated as a charter organization but now functions as a holding company for a single aircraft. [Def.'s SMF ¶ 30; Pl.'s Dep. Tr. 55:3–25, Def.'s SMF Ex. D (Docket No. 46-4).] Plaintiff testified that WHC never

did business with the DRBA and that, in his view, it would have been inappropriate to do so.  [Pl.'s Dep. Tr. 56:17–25.]

In late 2021 and early 2022, however, Plaintiff had discussions with the DRBA's Property Manager Michelle Griscom, about WHC entering into a ground lease with the DRBA in order to build a hangar on DRBA property.  [Def.'s SMF ¶ 34.]  Plaintiff explained that WHC sought to house an AW139, a large $20 million helicopter, in the hangar.  [*Id.* ¶¶ 36–37.]  During these discussions, Plaintiff referred to WHC as "his client" rather than himself, despite being the sole owner of the company.  [*See id.* ¶¶ 36–38.]  Ms. Griscom sent Plaintiff a draft lease for review in late January 2022.  [*Id.* ¶ 40.]

Just weeks later, Plaintiff expressed interest in also purchasing two existing hangars from the DRBA on behalf of WHC.  [*Id.* ¶¶ 41–43.]  Ms. Griscom reached out to the DRBA's Director and Assistant Director of Airport Operations, Mr. Williams and Benjamin Clendaniel, respectively, about whether the hangars could be sold to Plaintiff and whether a public sale process was required.  [*Id.* ¶ 44.]  On February 28, 2022, Mr. Williams responded that he was "uncomfortable doing this level of potential business with a DRBA airport employee" because there are "too many opportunities for conflict."  [Def.'s SMF Ex. S at DRBA 000459 (Docket No. 46-5).]  He noted that "[w]hen such personal situations arise, it is best for the parties to separate in the interest of clarity," and proposed advising Plaintiff "that he must make a choice."  [*Id.*]

Michelle Warner, DRBA Counsel & Chief Ethics Officer, agreed with Mr. Williams's "conflict concerns, particular because [Plaintiff] does not appear to understand the line between his private business operations and his role as a DRBA employee." [*Id.* at DRBA 000458.]  She explained, though, that "casual employees [such as Plaintiff] do not have the same right to counseling or progressive discipline as full-time employees enjoy," and that when issues have arisen in the past with casual employees, "the recommendation has been to terminate the employee rather than engage in a disciplinary process." [*Id.*][2]  That same day, Mr. Williams indicated that his "recommendation is to separate [Plaintiff] from the DRBA," but suggested a call to "decide if that is the best path forward for DRBA." [*Id.*]

Plaintiff continued to express his interest in purchasing the two hangars. [Def.'s SMF ¶ 49.]  On April 20, 2022, Mr. Williams directed Ms. Griscom to "hold off on any talks" because he and the DRBA Executive Director, Tom Cook, would be speaking with Plaintiff in the coming week. [*Id.* ¶ 50.]  The following week, Plaintiff emailed Ms. Griscom, DRBA's outside counsel, and Cape May County Commissioner Will Morey following up on the two hangars. [Def.'s SMF Ex. S at DRBA 000456–57.]  Plaintiff copied Commissioner Morey on his correspondence

---

[2]     As part of this discussion, the individuals distinguished Plaintiff's circumstances from those of another DRBA employee, Angelo Grant.  He too faced conflict of interest concerns and, because he was a full-time employee, was offered the choice to either pursue his business arrangements with the DRBA or continue as a DRBA employee, but not both.  Mr. Grant chose to remain employed by the DRBA. [Def.'s SMF ¶ 46.]

6

because he was "the freeholder that oversees the DRBA agreement, or is the freeholder that has oversight of other entities on the airport" and he believed Commissioner Morey would "bring some insight" into the conversation since Plaintiff was not "getting any discussion from" the DRBA or its attorneys. [Pl.'s Dep. Tr. 96:3–22.] Plaintiff believed that involving a county commissioner might expedite or facilitate his negotiations with the DRBA because of his "relationships" and "vested interest in the DRBA." [*Id.* 103:7–13.] Plaintiff then hired an attorney to assist him in the negotiations as well. [*Id.* 86:7–18.]

Once Ms. Griscom heard from Plaintiff's counsel, she forwarded the correspondence to Mr. Williams, who, two days later, on May 12, 2022, looped in Ms. Warner, Mr. Cook, Mr. Clendaniel, Mr. Berry, as well as DRBA Chief Human Resources Officer, Charlotte Crowell. [Def.'s SMF Ex. S at DRBA 000454.] Mr. Williams explained that he hoped to bring the issues with Plaintiff to a close and requested a call to discuss. [*Id.*] He noted that "this is an issue that has many sides and the potential to get ugly for the DRBA." [*Id.*]

### D. Plaintiff's Termination

Two weeks later, Plaintiff's employment with the DRBA was terminated on May 28, 2022, during a meeting with Messrs. Williams, Clendaniel, and Berry. [Def.'s SMF ¶ 67.] Mr. Williams made the decision to terminate Plaintiff's employment because of his attempts to engage in personal business dealings with the DRBA, resulting in a conflict of interest, after consulting with DRBA counsel and the

Executive Director, Mr. Cook, who agreed with the decision.   [Williams Dep. Tr. 75:21–77:12.]   Mr. Williams had not previously been involved in the actual termination of any DRBA employees, but he chose to personally handle Plaintiff's termination because of Plaintiff's "political connections" with members of the Cape May County and DRBA Commissioners and because Plaintiff had been hired personally by Mr. Cook, the DRBA Executive Director.   [*Id.* 39:16–41:16.] The termination meeting took place on a Saturday during Plaintiff's scheduled working hours because he was unavailable on the weekday that had been proposed by Mr. Berry.   [Def.'s SMF ¶ 70.]

Plaintiff testified that he was told during the termination meeting that he would be receiving a letter describing the reasons for his termination.   [Pl.'s Dep. Tr. 51:2–24.] After his termination, Plaintiff called human resources to request the letter of separation and the representative, Wendy Decker, stated she was unaware if he would get one and would have to find out.   [Decker Dep. Tr. 15:9–14, Def.'s SMF Ex. X (Docket No. 46-5).]  Ms. Decker testified that, in her experience, casual employees do not receive separation letters when they are terminated.   [*Id.* 36:1–9.]  Ms. Decker confirmed this with her superiors and called Plaintiff back to inform him that he would not be receiving such a letter.   [*Id.* 37:8–39:7.]

### E.  Plaintiff's Alleged Protected Activity

Plaintiff claims that on March 14, 2022, he had a conversation with another DRBA employee, Courtney Causey, during which Mr. Causey expressed concerns

8

about racial discrimination.  [Def.'s SMF ¶ 85.]  According to Plaintiff, Mr. Causey explained that he learned that someone had called him a racial slur and made other "racial comments" about him.  [*Id.* ¶¶ 88–89.]  Plaintiff told Mr. Causey that he would report it to Mr. Berry, his supervisor.  [*Id.* ¶ 91.]  Plaintiff testified that, roughly thirty minutes later, he spoke with Mr. Berry in person about his conversation with Mr. Causey and that Mr. Berry said that "he would take care of it" and would speak to Mr. Clendaniel about it.  [*Id.* ¶¶ 94–96, 107.]  There is uncertainty as to whether Plaintiff may have spoken to Mr. Berry about this via phone, either instead of or in addition to in person.  [*See generally id.* ¶¶ 97–104.]  Plaintiff did not speak to anyone else at the DRBA about his conversation with Mr. Causey, nor did he lodge a formal complaint in the DRBA complaint reporting system.  [*Id.* ¶ 110.]  Plaintiff did not hear anything further about this.  [Pl.'s SMF ¶ 6.]

Mr. Causey testified that he recalls telling Plaintiff that he heard another employee had referred to him using a racial slur.  [Causey Dep. Tr. 28:10–29:5, Def.'s SMF Ex. Y (Docket No. 46-5).]  Mr. Causey's own supervisors had informed him about this and had taken "care of it before [he] even knew what was going on." [*Id.* 29:11–30:8.]  He did not recall Plaintiff saying that he would speak to Mr. Berry about their conversation.  [Def.'s SMF ¶ 117.]  Mr. Causey saw no need for it to be reported at that time since the issue "had already been taken care of" and the DRBA already knew of it.  [Causey Dep. Tr. 46:6–17.]  Plaintiff was told by Mr. Causey that the racial remark was already being investigated.  [Def.'s SMF ¶ 120.]

Mr. Berry testified that Plaintiff never spoke to him about Mr. Causey being called a racial slur and that no one from human resources ever made him aware of this allegation. [Berry Dep. Tr. 61:12–24.] Mr. Clendaniel testified that he first learned of this allegation in Spring 2023. [Clendaniel Dep. Tr. 42:9–24, Def.'s SMF Ex. O (Docket No. 46-5).] Mr. Williams testified that he first heard of the allegation that Mr. Causey was called a racial slur in January 2023, but that he was unaware that Plaintiff had a conversation about this with Mr. Causey and supposedly reported it to Mr. Berry. [Williams Dep. Tr. 88:1–21.]

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 7, 2023. [EEOC Charge, Def.'s SMF Ex. O (Docket No. 46-5).] Ms. Crowell, the DRBA's Chief Human Resources Officer, testified that she was unaware that Mr. Causey was allegedly referred to by a racial slur until Plaintiff's EEOC charge was filed. [Crowell Dep. Tr. 38:3–40:12, Def.'s SMF Ex. V (Docket No. 46-5).]

## II. PROCEDURAL HISTORY

Based upon these facts, Plaintiff filed suit against Defendant, as well as Messrs. Berry, Williams, and Clendaniel, on November 24, 2023. [Compl. (Docket No. 1).] He alleged a single count of retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964. By stipulation of the parties, Plaintiff withdrew his claim against Messrs. Berry, Williams, and Clendaniel. [Stip. (Docket No. 7).] The only remaining defendant is the DRBA.

Upon the conclusion of discovery, Defendant filed the instant Motion for Summary Judgment. The briefing is now complete, and the motion is ripe for adjudication.

### III.   LEGAL STANDARD

Summary judgment is granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether a genuine dispute of material fact exists, "all evidence is viewed in the light most favorable to the non-moving party and 'all justifiable inferences are to be drawn in his favor.'" *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 220 (3d Cir. 2024) (quoting *Anderson*, 477 U.S. at 255). A "mere scintilla of evidence," however, does not generate a genuine dispute of material fact. *Anderson*, 477 U.S. at 252.

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)). Then, "when a properly supported motion for summary judgment [has been]

11

made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 250 (citing FED. R. CIV. P. 56(e)). The nonmovant's burden is rigorous. The nonmovant "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment.")). If the nonmoving party "'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial,' then summary judgment is appropriate for the moving party." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (quoting *Celotex*, 477 U.S. at 322).

## IV.    DISCUSSION

The anti-retaliation provision of Title VII prohibits an employer from discriminating against an employee who has "opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" related to the same. 42 U.S.C. § 2000e-3(a).

Plaintiff's Title VII retaliation claim, which relies upon circumstantial evidence, is subject to the familiar three-step burden-shifting analysis set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

12

*Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016) (collecting cases);

*Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006).

Under this analysis, a plaintiff must first establish a *prima facie* case that he was retaliated against by showing that (1) he engaged in protected activity; (2) his employer took an adverse employment action against him; and (3) there was a causal connection between the protected activity and the adverse employment action. *Moore,* 461 F.3d at 340–41; *see also Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022).

"If the employee establishes this *prima facie* case of retaliation, . . . 'the burden shifts to the employer to advance a legitimate, non-retaliatory reason' for its conduct and, if it does so, 'the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Moore*, 461 F.3d at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)).[3] To survive a defendant's summary

---

[3]    Plaintiff incorrectly claims that he can prove his claim via a "mixed motive" approach and that he need not show that a wrongful retaliatory motive was the determinative factor leading to his termination so long as it was a motivating factor. [Pl.'s Opp'n at 8–9, 12.]  The Supreme Court squarely rejected this approach over a decade ago. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  In *Nassar*, the Supreme Court held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m) [i.e., the motivating factor test].  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*  The Third Circuit has since reiterated that "but-for" causation is functionally the same as the "determinative effect" causation standard. *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 258 (3d Cir. 2017).  In other words, "[t]o prove a 'determinative effect,' the plaintiff must show by a preponderance of the evidence that there is a 'but-for' causal connection between the adverse

judgment motion, "a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions." *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

### A. Causation

The Court assumes without finding that Plaintiff can at least raise a genuine dispute of fact as to the first two elements of his retaliation claim and focuses its analysis on the final element: causation.[4]

"A plaintiff may rely on a broad array of evidence to demonstrate the causal link between the protected activity and the adverse employment action taken. [He] can meet this burden by proffering evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity unusually suggestive of retaliatory motive." *Carvalho-Grevious*, 851 F.3d at 260 (cleaned up). "These are not the exclusive ways to show causation,

---

employment action and retaliatory animus." *Id.* (internal citations and quotations omitted).

[4]    Plaintiff appears to raise a genuine dispute of material fact as to whether he engaged in protected activity by reporting racial discrimination against his coworker to his supervisor. Defendant does not seriously dispute that this conduct, if proven, constitutes protected activity that satisfies the first element of his retaliation claim. Instead, Defendant argues that there is no evidence – other than Plaintiff's self-serving testimony – that supports Plaintiff's claim and that this evidence should be disregarded under an extension of the "sham affidavit" doctrine. [Def.'s Br. at 8–9.] Because the Court finds that Plaintiff can establish neither causation nor pretext, the Court need not reach this issue.

The parties do not dispute that Plaintiff was terminated from his employment with the DRBA, thereby establishing an adverse employment action for purposes of the second element.

as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Id.* (internal citation omitted).

Defendant argues that Plaintiff cannot establish a causal link between his alleged protected activity and his termination for two primary reasons: (1) the recommendation to terminate Plaintiff was made prior to his alleged protected activity, and (2) Mr. Williams was not aware of Plaintiff's alleged protected activity at any time prior to Plaintiff's termination. [Def.'s Br. at 10.] The Court agrees on both fronts.

### i.    The Recommendation to Terminate Plaintiff's Employment Occurred Before Any Alleged Protected Activity

Plaintiff claims he engaged in protected activity on March 14, 2022. [Def.'s SMF ¶¶ 94–96.] Yet Mr. Williams first made the recommendation to terminate Plaintiff's employment two weeks prior, on February 28, 2022, in response to concerns raised about conflicts of interest between Plaintiff's DRBA employment and personal business. [Def.'s SMF Ex. S at DRBA 000458.] Plaintiff does not dispute that. This dooms his case.

"Employers need not suspend previously planned [adverse actions] upon discovering that [protected activity has taken place], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatsoever of causality." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001); *see also Mihalko v. Potter*, 2003 WL 23319594, at *14 (W.D. Pa. Dec. 12, 2003), *report and recommendation adopted* (Jan. 6, 2004) (collecting cases).

15

Plaintiff concedes that "if the decision to terminate [him] was made before his protected conduct, [he] would be unable to establish causation." [Pl.'s Opp'n at 13.] He claims that his case is distinguishable from *Breeden* and its progeny, however, because the final decision to terminate his employment occurred after his alleged protected activity. But this misses the point. The Supreme Court expressly rejected this argument in *Breeden*, finding that it was "immaterial" that the plaintiff's termination was not finalized and did not occur until after the alleged protected activity took place. *Breeden*, 532 U.S. at 272.

And Plaintiff "may not insulate [himself] from termination by covering [himself] with the cloak of Title VII's opposition protections after committing non-protected conduct that was the basis for the decision to terminate," namely engaging in business dealings with the DRBA on his own behalf while simultaneously employed by the DRBA. *Proudfoot v. Arnold Logistics, LLC*, 629 F. App'x 303, 308 (3d Cir. 2015) (quoting *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.*, 450 F.3d 130, 137 (3d Cir. 2006)). The conflict of interest concerns were well documented in advance of the recommendation to terminate Plaintiff's employment. "If subsequent conduct could prevent an employer from following up on an earlier decision to terminate, employers would be placed in a judicial straight-jacket not contemplated by Congress." *Curay-Cramer*, 450 F.3d at 137. Any dispute as to when the actual final decision to terminate Plaintiff's employment was made is simply

"immaterial" to the Court's inquiry and does not raise an issue for trial that survives summary judgment.

### ii.    Mr. Williams Had No Knowledge of Plaintiff's Alleged Protected Activity Prior to Plaintiff's Termination

"A reasonable jury [cannot] draw an inference of retaliatory motive . . . where a plaintiff fails to adduce any evidence that the 'individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted.'" *Day v. New Jersey Dep't of Corr.*, 2025 WL 3206676, at *3 (3d Cir. Nov. 17, 2025) (quoting *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015)).  That is the case here.  There is no evidence in the record that Mr. Williams, the ultimate decision maker involved in Plaintiff's termination, was aware that he allegedly reported racial discrimination to his supervisor at any time prior to his termination.

Plaintiff does not dispute that Mr. Williams made the decision to terminate his employment on May 28, 2022.  Yet Mr. Williams testified that he was not aware that Mr. Causey had been called a racial slur until January 2023, over seven months after Plaintiff's employment was terminated.  And even then, he was not aware that Plaintiff was allegedly involved in reporting that incident.  [Williams Dep. Tr. 88:1–21.]

Plaintiff does not point to any evidence in the record that contradicts this testimony.  Instead, he submits a list of twelve statements that he contends demonstrate that "Plaintiff's protected conduct was a substantial motivating factor in his termination."  [Pl.'s Opp'n at 15–17, 17 n.3.]  The Court reiterates that this is not the correct standard for causation in the context of Title VII retaliation claims.

17

Plaintiff must point to evidence that establishes that his protected activity was not only a substantial motivating factor, but the determinative or but-for cause of his termination. *Nassar*, 570 U.S. at 360; *Carvalho-Grevious*, 851 F.3d at 258.

Nonetheless, the Court has considered these statements and finds that they do not raise a triable issue of fact. To the contrary, all invite the Court to engage in speculation, which it cannot do. *Acumed*, 561 F.3d at 228 ("[S]peculation and conjecture may not defeat summary judgment.")).

First, Plaintiff claims that the circumstances of his termination were unusual and that this somehow suggests that Mr. Williams did in fact know of Plaintiff's alleged protected activity prior to his termination. He points to the fact that he was terminated on a Saturday and that Mr. Williams, the Deputy Executive Director of the DRBA, was directly involved in the termination despite never having previously been directly involved in an employee's termination. [Pl.'s Opp'n at 15.] But the undisputed evidence shows that Plaintiff was unavailable during regular business hours on Friday, May 27, 2022, which was the date originally proposed by the DRBA for the meeting. So, instead, the meeting was scheduled for a time that Plaintiff would already be at work to accommodate his schedule. [Def.'s SMF ¶ 70.] And Mr. Williams explained that he chose to be involved in Plaintiff's termination because of the political sensitivities involved, given Plaintiff's former political position and his connections with the Executive Director and various Cape May County and DRBA Commissioners. [Williams Dep. Tr. 39:16–41:16.] There is no record evidence

surrounding the circumstances of Plaintiff's termination that suggest Mr. Williams was aware of his alleged protected activity.

Plaintiff then points to the testimony of Ms. Crowell, the DRBA's Chief Human Resources Officer, related to her investigation into Plaintiff's EEOC charge in March 2023. [Pl.'s Opp'n at 15–16.] Ms. Crowell testified that Mr. Williams told her in March 2023 that he had first learned about the incident with Mr. Causey from Mr. Berry in January 2023. [Crowell Dep. Tr. 75:1–77:23.] This is consistent with Mr. Williams's own testimony. Plaintiff also emphasizes that Ms. Crowell believed that Mr. Berry was untruthful during her investigation as to when and how he became aware of incident involving Mr. Causey. [Pl.'s Opp'n at 15–16.] But there is neither evidence nor allegation that Mr. Berry escalated Plaintiff's comments to Mr. Williams while Plaintiff was still employed by the DRBA. So, even if Ms. Crowell's testimony is sufficient to impeach Mr. Berry's credibility, it has no bearing whatsoever on whether Mr. Williams was aware of the incident prior to Plaintiff's termination.

Next, Plaintiff intimates that he should have been given the choice to explore business opportunities with the DRBA or remain employed by the DRBA, as was done for full-time employee, Mr. Grant. [Pl.'s Opp'n at 16–17.] But the DRBA considered whether this was the appropriate approach – well before his alleged protected activity occurred – and determined that it was not, because Plaintiff was not entitled to progressive discipline as a part-time casual employee and he did "not appear to

19

understand the line between his private business operations and his role as a DRBA employee." [Def.'s SMF Ex. S at DRBA 000458.]

Finally, Plaintiff argues that he was promised a letter documenting the reasons for his termination by either Mr. Williams or Mr. Clendaniel and that he never received such a letter. [Pl.'s Opp'n at 16–17.] It is unclear how this suggests that Mr. Williams knew of his alleged protected activity prior to his termination. In any event, Mr. Williams testified that there had been a mistake on either his or Mr. Clendaniel's part regarding the letter. [Williams Dep. Tr. 81:18–82:14.] Both Ms. Crowell, the Chief Human Resources Officer, and Ms. Decker, a DRBA human resources technician, confirmed that casual employees do not receive letters outlining the reasons for their termination. [Crowell Dep. Tr. 90:21–25; Decker Dep. Tr. 36:1–9; 37:4–39:7.]

None of these "facts" are sufficient, individually or collectively, to raise a genuine dispute of material fact as to Mr. Williams's knowledge of Plaintiff's alleged protected activity at the time of his termination. They are nothing more than speculation and conjecture, which do not defeat summary judgment. *Acumed*, 561 F.3d at 228; *Orsatti*, 71 F.3d at 484.

A causal connection cannot be established "without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels*, 776 F.3d at 196–97. Put plainly, "[w]ithout knowledge, there can be no retaliatory intent, and thus there can be no causal

20

connection." *Romero v. Allstate Ins. Co.*, 3 F. Supp. 3d 313, 328 (E.D. Pa. 2014), *aff'd sub nom. E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444 (3d Cir. 2015) (quoting Barbara T. Lindemann & Paul Grossman, 1 *Employment Discrimination Law* 1034 (4th ed. 2007)). Here, Plaintiff has not proffered any record evidence that Mr. Williams, the individual responsible for his termination, knew of his alleged protected activity before or at the time of his termination. "Instead, the record establishe[s] the opposite;" Mr. Williams testified that he decided to terminate Plaintiff's employment due to ethical concerns and that he was not aware of Plaintiff's alleged protected activity until over seven months after Plaintiff had been terminated. *See McCrorey v. City of Phila.*, 2025 WL 1392164, at *4 (3d Cir. May 14, 2025). No reasonable juror could "infer that [the DRBA's] reaction was motivated by an intent to retaliate for conduct of which [its] decision maker was not aware." *Moore*, 461 F.3d at 351 (3d Cir. 2006).

---

Plaintiff cannot establish the third element of a prima facie case of retaliation. There is no causal connection between his termination and the alleged protected activity. Here, before the alleged activity had even taken place, Mr. Williams had already recommended that Plaintiff's employment be terminated. What's more, Mr. Williams did not become aware of the alleged protected activity until months following Plaintiff's termination. "In this situation where the termination had already commenced before notice of the protected activity, Plaintiff cannot establish the causation required for a retaliation claim." *Rene v. Lidestri Foods, Inc.*, 2010 WL

21

4807050, at *9 (D.N.J. Nov. 17, 2010). Accordingly, Plaintiff fails to raise a genuine dispute of fact for trial as to causation and summary judgment must be granted.

### B. Pretext

Even assuming that Plaintiff could establish a prima facie case of retaliation – which, to be clear, the Court finds he cannot – the burden would then shift to Defendant to articulate a legitimate non-retaliatory reason for his termination, which it clearly has. The DRBA terminated Plaintiff's employment due to ethical concerns regarding his attempts to engage in private business dealings with the DRBA while remaining employed by the DRBA.

Defendant has met its "relatively light" burden. *Fuentes*, 32 F.3d at 763. So, the burden shifts back to Plaintiff to produce "sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." *Krouse*, 126 F.3d at 504. To do so, Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Qin v. Vertex, Inc.*, 100 F.4th 458, 474–75 (3d Cir. 2024). This is generally accomplished "by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a

22

reasonable factfinder could rationally find them 'unworthy of credence.'" *Id.* (quoting *Fuentes*, 32 F.3d at 765).

Plaintiff does not address pretext separately in his papers. Instead, he relies on the same speculation and conjecture that the Court has already rejected as part of his attempt to establish an issue of fact as to causation. [Pl.'s Opp'n at 17.] "The onus is on the plaintiff to establish causation at two stages of the case: initially, to demonstrate a causal connection as part of the prima facie case and at the final stage of the *McDonnell Douglas* framework to satisfy [his] ultimate burden of persuasion by proving pretext." *Carvalho-Grevious*, 851 F.3d at 257. The Court has already found that Plaintiff cannot establish causation initially as part of the prima facie case. For the same reasons cited above, he once again fails to do so at the pretext stage.

Plaintiff also attempts to poke holes in Defendant's articulated legitimate reason for his termination by pointing out that Mr. Grant was offered the choice to remain employed by the DRBA or continue pursuing business opportunities with the DRBA. But, once again, Mr. Grant was a full-time employee with progressive discipline rights, not a part-time casual employee, like Plaintiff. [Def.'s SMF ¶ 46.] To borrow Plaintiff's own language, this is "an apples to oranges comparison," [Pl.'s Opp'n at 18],[5] and is insufficient to establish pretext.

---

[5]    Plaintiff argues that the Court should not consider the fact that another DRBA employee, Andrew Bunn, also reported the incident during which Mr. Causey was called a racial slur and suffered no adverse employment action because "Mr. Bunn is a full-time employee who has more employment protections than a part-time casual employee." [Pl.'s Opp'n at 18.] He calls this "an apples to orange comparison." [*Id.*]

Plaintiff similarly contends that Defendant's concerns over conflicts of interest are disingenuous and should be disbelieved for two reasons.  First, he claims that his termination cannot be premised upon the flight school's complaint against him regarding his alleged offer to rent out his aircraft to a flight student because it occurred far before his termination, was never investigated, and because he received verbal counseling after the complaint.  [Pl.'s Opp'n at 19–20.]  But the complaint was received just two weeks before Mr. Williams made his recommendation to terminate Plaintiff's employment and Mr. Williams testified that he found the complaint credible and serious.  [Williams Dep. Tr. 77:13–78:4.]  And Plaintiff was simultaneously actively engaging in business negotiations on behalf of his company with the DRBA.

Next, Plaintiff contends that the DRBA took inconsistent approaches that undermine the proffered reason for his termination.  At the time he was hired, Plaintiff rented a hangar from the DRBA in his personal capacity and the DRBA never took issue with this.  [Def.'s SMF ¶ 13.]  This, in Plaintiff's view, is sufficient to establish that Defendant's articulated legitimate reason is false.  [Pl.'s Opp'n at 20.]  But that mischaracterizes Defendant's articulated reason.  Defendant does not claim to have fired him because he rented a hangar for his personal use.[6]  Instead, his employment was terminated because his private *business* interests competed with those of the

---

[6]    Nor does Defendant purport to have terminated his employment due to poor job performance.  Plaintiff's belief that his positive performance evaluation somehow calls into question Defendant's articulated reason similarly falls flat.  [Pl.'s Opp'n at 22.]  His performance evaluation is not relevant to this inquiry.

24

DRBA. Indeed, Mr. Williams confirmed as much in his email recommending his termination: "In my mind, there is a significant difference [between] simply owning one or more aircraft with a simple T-Hangar agreement vs. leasing land and conducting an aviation business on property while also an employee." [Def.'s SMF Ex. S at DRBA 000459.]

Not only are Plaintiff's arguments not supported by the record, but they appear to challenge the DRBA's reason as "wrong or mistaken," rather than untrue. *See Fuentes*, 32 F.3d at 765. Calling into question the "wisdom" of the DRBA's decision to terminate his employment "does not create a genuine dispute that the [DRBA's reason] 'was false, and that retaliation was the real reason for the adverse employment action." *Smith v. City of Atl. City*, 138 F.4th 759, 778 (3d Cir. 2025) (quoting *Moore*, 461 F.3d at 342); *see also Fuentes*, 32 F.3d at 765 (to demonstrate pretext, "plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

Plaintiff "has failed to offer more than speculation about any possible pretext." *Anderson v. Boeing Co.*, 694 F. App'x 84, 88 (3d Cir. 2017). He has pointed to no evidence from which a jury could reasonably disbelieve Defendant's articulated legitimate reason for his termination or believe that retaliation was more likely than not the cause for his termination. Accordingly, summary judgment must be granted.

25

## V.    CONCLUSION

For the above-stated reasons, Defendant's Motion for Summary Judgment is **GRANTED**.    Plaintiff's sole claim for retaliation in violation of Title VII is **DISMISSED WITH PREJUDICE**.    An accompanying Order shall issue separately on this date.    FED. R. CIV. P. 58(a).

/s/Renée Marie Bumb
RENÉE MARIE BUMB
Chief United States District Judge

DATED: March 26, 2026